**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Elizabeth Jane Fowler, | ) |
| *Plaintiff* | ) |
| vs. | ) |
| Syracuse University, | ) |
| *Defendant* | ) |

**Civil Case No.:**
5:14 CV1350 (LEK/TWD)

**CIVIL COMPLAINT**
**PURSUANT TO THE**
**AMERICANS WITH**
**DISABILITIES ACT**



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
NOV - 7 2014
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

Plaintiff demands a trial by: JURY

Plaintiff in the above-captioned action alleges as follows:

## JURISDICTION

1.   This is a civil action seeking judgment, relief and/or damages brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., as amended, for discrimination based upon a disability and the failure to accommodate same. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(4).

## PARTIES

4.   Plaintiff: Elizabeth Jane Fowler
     Address: 1062 Lancaster Avenue
              Syracuse, NY  13210

5.   Defendant: Syracuse University
     Address: Skytop Office Building, Room 101
              Syracuse, NY  13244

6.   My disability is as follows:

     In or about March of 2012, the Plaintiff had a spinal fusion in her neck. The

Plaintiff first became symptomatic in or around October of 2011, but did not have the surgery until a later date. This disability resulted in extreme pain, which also exacerbated the Plaintiff's previously diagnosed clinical depression.

7.    The conduct complained of in this action involves:

(A) Disability Discrimination
(B) Termination of Employment
(C) Retaliation

8.                                **FACTS**

                              **(see attached)**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Elizabeth Jane Fowler, | ) |
| *Plaintiff* | ) |
| vs. | ) |
| Syracuse University, | ) |
| *Defendant* | ) |

Civil Case No.:

**CIVIL COMPLAINT**
**PURSUANT TO**
**TITLE VII OF THE**
**CIVIL RIGHTS ACT,**
**AS AMENDED**

Plaintiff demands a trial by: JURY

## JURISDICTION

1.     Jurisdiction is conferred on this court pursuant to 42 U.S.C. § 2000e-5.

## PARTIES

2.     Plaintiff: Elizabeth Jane Fowler
        Address: 1062 Lancaster Avenue
                     Syracuse, NY  13210

3.     Defendant: Syracuse University
        Address: Skytop Office Building, Room 101
                     Syracuse, NY  13244

4.     This action is brought pursuant to:

        Pregnancy Discrimination Act of 1978, codified at 42 U.S.C. § 2000e(k), as amended,
        Civil Rights Act of 1964, and the Civil Rights Act of 1991, for employment
        discrimination based on pregnancy.

5.     Venue is invoked pursuant to 28 U.S.C. s 1391.

6.     Defendant's conduct is discriminatory with respect to the following:

        (A) My pregnancies.

7.  Defendant's conduct is discriminatory with respect to the following:

(A) Termination of employment.
(B) Failure to promote.
(C) Unequal terms and conditions of employment.
(D) Retaliation.

8.

**FACTS**

**(see attached)**

8.                              **FACTS**

9.      Elizabeth Fowler ("Plaintiff") was employed by Syracuse University ("Defendant") from

or about August 15, 2004 until on or about January 15, 2014, the date of her unlawful termina-

tion.

10.     Upon commencing employment with the Defendant, the Plaintiff held the position of Vis-

iting Instructor of Art History. In or about January of 2006, as a result of the completion of her

dissertation, the Defendant promoted the Plaintiff to the rank of tenure-track, Assistant Professor,

and was a faculty member in the Department of Art Foundation ("Department" in Syracuse Uni-

versity's School of Art and Design, part of the College of Visual and Performing Arts).

11.     The Plaintiff was always dedicated to her job and always received satisfactory or better

ratings in her performance reviews, prior to the onset of her disabilities. Performance reviews, by

their very nature, offer constructive criticism regarding how the faculty member can improve his/

her curriculum vitae ("CV"), but the written feedback, overall, was positive. In the qualitative

measures of performance, the Plaintiff always received satisfactory or better ratings; moreover,

the Plaintiff always received unanimous Departmental approval in her "Annual Performance Re-

views."

12.     By way of example, the year prior to her initial termination, the 2011 calendar year, the

Plaintiff received merit raises for exceptional performance, from both the Chair of the Depart-

ment and the Dean of the College. The Plaintiff's "Teaching and Advising" were ranked as "Very

Good;" her "Research/Creative Work" were ranked as "Very Good;" and her "Service" was

ranked as "Good." The Department voted unanimously, in a 5-0 vote, to renew her annual contract.

13.     The Plaintiff also received a merit raise from the Dean for the 2010 calendar year, for exceptional performance. The Plaintiff's "Teaching and Advising" were ranked as "Very Good;" her "Research/Creative Work" were ranked as "Very Good;" and her "Service" was ranked as "Good." The Department voted unanimously, in a 5-0 vote, to renew her annual contract.

14.     The Plaintiff's Department had a tripartite division for its "Annual Performance Evaluation Criteria." As noted in Departmental documentation, the three categories were "Needs Improvement," "Expected (Good)," and "Excellent." This wording was not used in the Plaintiff's "Annual Performance Reviews," but instead "Good" served as the middle criterion, and "Very Good," served as the highest achievable criterion.

15.     The Plaintiff, prior to her developing her disabilities, was notified by the Defendant in writing on or about May 16, 2012, that she was "on track" to receive tenured professorial status at Syracuse University.

16.     The Plaintiff first became symptomatic in or about October of 2011 and suffered from a compressed nerve, which resulted in nerve pain. This extreme pain exacerbated the Plaintiff's previously diagnosed clinical depression.

17.     Said medical conditions are disabilities under the ADA and New York State Human Rights Law ("NYSHRL") in that it substantially impairs one or more of the Plaintiff's major life activities including, but not limited to, her ability to lift and carry, her ability to walk more than minimal distances, her ability to sit for sustained periods of time, her ability to stand for sus-

tained periods of time, her ability to type for sustained periods of time, her ability to maintain focused concentration, such as that required for research and writing, and her ability to sleep.

18.    In or about March of 2012, the Plaintiff took her first informal disability leave for neck surgery. In advance of doing so, the Plaintiff notified the Defendant in writing that she would be canceling classes for one week, which resulted her missing only a total of four class sections.

19.    Due to the Plaintiff's disabilities as well as the treatments prescribed by her physicians, aimed at ameliorating her physical pain, the Plaintiff realized on or about April 16, 2012, that she had been unable to meet the expectations of the the Department, namely scholarship, required for tenure, as she had difficulty typing and concentrating due to her disabilities. The Plaintiff requested that her tenure-clock be stopped for the 2011-12 academic year. This was approved in writing, a copy of which was sent to the Plaintiff, by the Defendant and the Plaintiff's tenure clock was stopped for this period.

20.    The Plaintiff has previously taken two "Parental Leaves," both of which were approved in writing by the Defendant, after the birth of her two children, for the 2008-09 and 2010-11 academic years. In subsequent Departmental meetings, these University-approved leaves of absence were discussed pejoratively, and were mentioned by several members of the Plaintiff's Departmental faculty as an indication that she was not dedicated to her job.

21.    The Department's "Annual Performance Evaluations" assessed performance over a calendar year. These meeting resulted in two "Letter of Recommendations:" one summarizing the content of the meeting and the Departmental vote; and the second the Chair's comments concerning issues brought up during the meeting and voting period. These letters were then to be shown to the professor and signed, acknowledging the receipt of this information, which was

then to be forwarded to the Dean. This is the procedure set for in the Departmental Bylaws, and this had been followed every year by the Department prior to the Department's vote in or around April of 2013.

22.     The period from or about January of 2012 to until or around December 2012 was the period to be discussed in the Plaintiff's 2013 "Annual Performance Evaluation." The stoppage of a tenure-clock, however, is for an academic year. The Plaintiff's tenure-clock stoppage for her disability was for the 2011-12 academic year, which covered the period from or about August 2011 through May 2012. Therefore, the only period for which the Plaintiff was to be evaluated was the Fall semester of 2012, covering the months from or about August of 2012 until or around December of 2012.

23.     When the Plaintiff's tenure-clock was previously stopped for her "Parental Leaves," the Department also considered the excluded period of time, during which her tenure-clock was stopped, in evaluating her performance, even though the Plaintiff notified the Department of this egregious error.

24.     In or around November of 2012, the Plaintiff received negative feedback from the Defendant, who noted that the Plaintiff's disabilities were becoming "an issue" regarding the Plaintiff's annual contract renewal and tenure advancement

25.     The Defendant demanded the Plaintiff to visit the Faculty and Staff Assistance Program (FSAP) to "talk to someone about [the Plaintiff's] problems." Without the Plaintiff's knowledge or permission, the Defendant had already informed the FSAP about the Plaintiff's disabilities.

26.    The Plaintiff informed the Defendant that she was already visiting a talk therapist and a psychiatrist of her own choosing and was continuing to seek medical treatment for her physical disability.

27.    The Defendant nevertheless demanded that the Plaintiff visit the FSAP, the Defendant went so far as to contact one of the FSAP's therapists to try to set up an appointment for the Plaintiff, without the Plaintiff's knowledge or permission.

28.    The Defendant, on or around October of 2012, took drastic steps to take control of the Plaintiff's courses, which was exceptional and unprecedented treatment. The Plaintiff's Department Chair unilaterally decided that a field trip, organized by the Plaintiff and required per her syllabus, was to be optional. The Plaintiff pointed out that no other faculty member had been treated in this manner, nor had the Department Chair ever before sought to change and dictate policy in an individual professor's classroom. The Plaintiff was informed, when she mentioned these facts, that she was being combative and hostile, and her reaction was cited by the Defendant as evidence that the Plaintiff's disability was impairing her judgement.

29.    The Defendant again requested a meeting with the Plaintiff, held off-campus in or about January of 2013, during which time the Plaintiff was provided with written materials from the FSAP, and the Defendant strongly suggested to the Plaintiff that if an appointment was not made, the Plaintiff would not be allowed to teach in the upcoming semester. Later that same month, the Defendant demanded that the Plaintiff stop teaching all of her courses due to "all of [the Plaintiff's] continuing problems," a demand which was dropped when the Plaintiff questioned the Defendant's authority to take such action.

30.     It was later discovered, without the Plaintiff's knowledge, that the Defendant had also informed Dana Butler of Syracuse University's Retirement and Leave of Absence Specialist in Human Resources about the Plaintiff's disabilities and surgery, again done without the Plaintiff's permission.

31.     The Plaintiff's Departmental "Annual Performance Evaluation" was held in or about April of 2013. The Department considered information from the excluded period when the Plaintiff's tenure clock was stopped, such as, but not limited to, teaching evaluations, noted a lack of publications during the time her clock was stopped, and used this information as criteria for evaluating the Plaintiff's performance.

32.     In or about the April 2013 "Annual Performance Evaluation" the Department again openly discussed the disconcerting "gaps" in the Plaintiff's CV for both her "Parental Leaves" and her "Disability Leave," again verbally citing these "gaps" as evidence that the Plaintiff was not dedicated to her job.

33.     In or about the April 2013, at the Plaintiff's "Annual Performance Evaluation," the Department commented on and reprimanded the Plaintiff for taking strong pain medication for her disability.  This medication, along with other medications to treat her disability, was prescribed by her treating physician, and the Plaintiff took the medication in accordance with the written prescription. The Department noted that on one occasion, the Plaintiff had taken this pain medication in front of students, and indicated that this was unprofessional and unacceptable behavior. The Department even went so far as to question the Plaintiff's treating physician's use of narcotic pain medication in the treatment of her disability.

34.    The Plaintiff's treating physician had cleared her for work and felt that she was able to perform the essential functions of her job with these disabilities and  while taking these medications.

35.    During all of the Plaintiff's "Annual Performance Evaluations," prior to developing her disabilities, the Plaintiff had been told that she was "on track for tenure." Constructive criticism had been included in her performance evaluations, as is the norm, but the Department and the Dean concluded that she was satisfactorily progressing towards achieving tenure.

36.    On or around April 18, 2013 — despite all of Plaintiff's past positive reviews — the Defendant notified the Plaintiff by phone after the "Annual Performance Evaluation" that the Department had declined to renew her annual contract, although she was denied the reasons for this action, and thus recommending that the Dean terminate the Plaintiff's annual contract and her tenure-track position.

37.    The Plaintiff was never shown the "Letters of Recommendation" and therefore never signed any documentation acknowledging that she had received the information. Nonetheless, this information was forwarded to the Dean of the College, and the Plaintiff was not afforded an opportunity to acknowledge or rebut the Department's findings.

38.    The Defendant, in a written letter, notified the Plaintiff that the Dean upheld the Department's decision, thus terminating the Plaintiff's annual contract and tenure-track position. The Plaintiff was further informed that she would be fired at the end of the 2013 academic year, and would be on a terminal annual contract. .

39.    By denying the Plaintiff access to the information contained in the "Letters of Recommendation," this made it impossible for the Plaintiff to engage in any sort of internal appeal with

the Defendant, as she was denied access to the reasons for her termination, and thus had no information for which she could provide counter arguments.

40.     This is in direct violation of the guidelines set forth by the American Association of University Professors ("AAUP"), which states that professors should have access to the documents relating to their termination and/or denial of tenure, so that they may respond to the specific information contained therein.

41.     Patrick Boyd, of The Boyd Law Group, the Plaintiff's retained legal counsel at that time, contacted the Defendant to raise concerns about their discriminatory practices. Almost immediately, the Plaintiff was placed back on the tenure track by the Defendant.

42.     The Plaintiff was reinstated in writing on or around June 3, 2013, by the Defendant but was never provided with a consensual employment contract; instead, a letter was simply sent in the mail for the upcoming 2013-14 academic year that did not provide any opportunity for the Plaintiff's consent.

43.     The Plaintiff was also informed by the Dean, in the letter dated on or around June 3, 2013, that her performance was as follows: her "Teaching" was rated as "needs improvement;" her "Research" was rated as "poor;" and her "Service" was rated as "poor." These, however, did not match the terminology employed by the Plaintiff's department (the three categories were "Needs Improvement," "Expected (Good)," and "Excellent"), so it was unclear whether the Dean or the Department was providing vague and misleading information regarding the terminology used in the evaluation process and how many categories they were using for the evaluation process. The Dean also stated that the Plaintiff had never received a rating of "Excellent" in the

last four years, yet this was not the terminology used in the Plaintiff's "Annual Performance Evaluations" by the Plaintiff's Department.

44.     The Defendant returned the Plaintiff to a hostile work environment, one where her colleagues had lost "faith in her," where basic procedural actions had been ignored, and where the "gaps" in her CV were discussed as an indication of poor job performance, instead of acknowledging their chronological overlap with the Plaintiff's tenure clock-stoppages.

45.     It was this same Department who would, in the following year, vote again to advise the Dean and the upper-administration regarding their recommendation for tenure.  The Plaintiff had received a vote terminating her contract, yet the Dean returned her to the same Department who was openly hostile to the Plaintiff, due to her "Parental Leaves," her "Disability Leave," and her disabilities.

46.     The Plaintiff never fully recovered from her initial disability due to a surgical failure and remained symptomatic until in or around December of 2013. The Plaintiff's treating physician authorized a formal "Disability Leave" from Syracuse University for the Fall semester of 2013, beginning in or about August 2013 until or about December of 2013. This leave was granted by the Defendant.

47.     Although the Plaintiff was again in extraordinary pain and completely unable to work, she did not ask for a tenure clock-stoppage.

48.     The Plaintiff continued to be harassed, treated unfairly, and discriminated against in the terms and conditions of her employment at SU because of her continued disability.

49.     By way of example, in or around September of 2013, while the Plaintiff was on Full Disability Leave, the Defendant demanded that she vacate her office for the entire Fall semester of

2013. Later the Defendant admitted in writing that it had no idea when the Plaintiff would be returning from Disability Leave, but yet still requested the Plaintiff vacate her office for the entire semester, treating her in a manner exceptional to all other Departmental members who had taken any form of leave. When it was pointed out in writing by the Plaintiff to the Defendant that this was exceptional and unprecedented treatment, the Defendant immediately dropped the request.

50.     By way of example, in or around November of 2013, the Defendant refused, without any policy justification, to print business cards for the Plaintiff. The Defendant stated in writing that although never investigating the formal policy, the Defendant determined that ordering business cards constituted "work" and refused order or pay for them, again treating the Plaintiff in a manner exceptional to all other departmental members.

51.     The Plaintiff's treating physician, after achieving a manageable and stable physical state, removed the Plaintiff from her Full Disability Leave in or around late December of 2013.

52.     At the time the Plaintiff was returned to work, she still had not received a formal contract from the Defendant, and her legal counsel at the time, Patrick Boyd, contacted the Defendant to arrive at a formal employment contract.

53.     In or around December of 2013, the Defendant contacted the Plaintiff to determine her intentions for the upcoming semester. The Plaintiff stated that she did not know, and that the Defendant should contact their General Counsel regarding this issue.

54.     In or around December of 2013, Patrick Boyd, the Plaintiff's legal representation at the time, forwarded a copy of the Plaintiff's Equal Employment Opportunity Commission (EEOC) charges to the General Counsel of the University, per the Defendant's request.

55.     On or around December 31, 2013, Patrick Boyd, the Plaintiff's legal representation at the

time, received a call from the Defendant's outside counsel, Peter Boyd, from Bond, Schoeneck &

King, and stated that the Defendant was open to begin negotiating the terms of the Plaintiff's

employment.

56.     The Defendant, despite being in active negotiations with the Plaintiff's legal counsel,

demanded to know what courses the Plaintiff would be teaching in the upcoming semester.  In or

around January of 2013, the Plaintiff replied in writing to the Defendant that her legal counsel

and the Defendant's outside counsel were actively determining whether the Plaintiff would be

teaching or on research leave. The Plaintiff indicated that once the two lawyers had worked out

the details of an employment contract, she would proceed accordingly.

57.     Despite receiving this information, the Defendant asked the Plaintiff on or around Jan-

uary 7, 2013, what classes she would be teaching in the upcoming semester, and advised her that

if she did not respond, classes would be assigned to her.

58.     On or around January 10, 2014, the Plaintiff was assigned two classes for the upcoming

semester by the Defendant in a manner exceptional to the treatment of the rest of her Departmen-

tal Faculty.

59.     Classes began on or around January 12, 2014.  The two lecture-based classes that which

had been assigned to the Plaintiff had, respectively, 4 and 5 students, well below the minimal re-

quirement for student enrollment.

60.     Due to the fact that the Defendant's outside counsel and the Plaintiff's current legal rep-

resentation were still in negotiations, the Plaintiff was advised by her lawyer not to attend the

first day of class, as this would continue the "at will" employment status with the Defendant due

to the lack of a contract, putting her in danger of retaliatory termination for filing EEOC charges against the Defendant, as well as the fact that the classes were under-enrolled.

61.     The Defendant demanded that the Plaintiff attend class, despite that the two lawyers had not yet concluded their talks and had yet to arrive at a concrete employment contract.

62.     The Defendant, in their enrollment system, cancelled both the classes on or around January 14, 2014 and later notified the Plaintiff, in writing, that the students were told the classes were cancelled due to lack of enrollment.

63.     The Plaintiff contacted the Defendant in writing on or around January 14, 2014, noting that the courses had been cancelled in the enrollment system, and asked if this meant that the Plaintiff was therefore placed on research leave for the upcoming semester.

64.     The Defendant notified the Plaintiff on or around January 15, 2014, that she was not being placed on research leave for the upcoming semester, and thus the Defendant constructively fired the defendant.

65.     The Defendant also notified the Plaintiff on or around January 15, 2014, that she was being terminated due to "job abandonment." This determination resulted in the denial of Unemployment Insurance Benefits.

66.     The Defendant terminated the Plaintiff's tenure-track position, and she was replaced with a less-qualified, less-experienced individual with no known disabilities or impairments.

67.                                    **FIRST CAUSE OF ACTION**
          **ADA — Disability Discrimination, Termination of Employment, Retaliation**

68.     The Plaintiff incorporates by reference paragraphs 8 through 66 of this Complaint as though full set forth at length therein.

69.     The actions of the Defendant, through its agents, servants, and employees, in (1) subject-

ing Plaintiff to discrimination based on her disability (neck surgery and depression), (2) retaliat-

ing against the Plaintiff for her disability, which twice resulted in the Plaintiff's termination.

70.     As a direct result of the aforesaid unlawful discriminatory and retaliatory employment

practices engaged in by the Defendant in violation of the ADA, the Plaintiff sustained permanent

and irreparable harm, resulting in the loss of her employment, which caused her to sustain a loss

of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay,

and form pay and interest due thereon.

71. As a further direct result of the aforesaid unlawful discriminatory and retaliatory employment

employment practices engaged in by the Defendant in violation of the ADA, the Plaintiff suf-

fered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.  The Plain-

tiff also suffered from severe physical pain, due to the exacerbation of existing medical condi-

tions and new severe physical ailments.

71.                          **SECOND CAUSE OF ACTION**
                **Pregnancy Clause, Title VII, The Civil Rights Act**

72.      The Plaintiff incorporates by reference paragraphs 8 through 66 of this Complaint as

though full set forth at length therein

73.     The actions of the Defendant, through its agents, servants, and employees, in (1) subject-

ing Plaintiff to discrimination based on her two pregnancies and, (2) citing these pregnancies and

resultant "Parental Leave" as an indication that the Plaintiff was not dedicated to her job, consti-

tuted a violation of the Pregnancy Clause of Title VII of The Civil Rights Act.

74.     As a direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by the Defendant in violation of the Pregnancy Clause of Title VII of The Civil Rights Act, the Plaintiff sustained permanent and irreparable harm, resulting in the loss of her employment, which caused her to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and form pay and interest due thereon.

75.     As a further direct result of the aforesaid unlawful discriminatory and retaliatory employment employment practices engaged in by the Defendant in violation of the ADA, the Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem. The Plaintiff also suffered from severe physical pain, due to the exacerbation of existing medical conditions and new severe physical ailments.

76.                                    **THIRD CAUSE OF ACTION**
                                       **New York Human Rights Act**

77.     The Plaintiff incorporates by reference paragraphs 8 through 66 of this Complaint as though full set forth at length therein

78.     The actions of the Defendant, through its agents, servants, and employees, in (1) subjecting Plaintiff to discrimination based on her disability (nerve pain, neck surgery and depression), (2) retaliating against the Plaintiff for her disability, which twice resulted in the Plaintiff's termination, constituted a violation of the New York Human Rights Act ("NYHRA").

79.     As a direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by the Defendant in violation of the NYHRA, the Plaintiff sustained permanent and irreparable harm, resulting in the loss of her employment, which caused her to sustain a

loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and form pay and interest due thereon.

80.     As a further direct result of the aforesaid unlawful discriminatory and retaliatory employment employment practices engaged in by the Defendant in violation of the NYHRA, the Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem. The Plaintiff also suffered from severe physical pain, due to the exacerbation of existing medical conditions and new severe physical ailments.

81.     The Plaintiff filed charges with the New York State Division on Human Rights, the New York City Commission on Human Rights or Equal Employment Opportunity Commission regarding the alleged discriminatory acts on or about: January 30, 2014.

82.     The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter (copy attached) which was received by me on or about: August 18, 2014.

83.     The plaintiff is an employee within the meaning of 42 U.S.C. § 2000e(f).

84.     The defendant(s) is (are) an employer, employment agency, or labor organization within the meaning of 42 U.S.C. § 2000e(b), (c), or (d).

85.     The defendant(s) is (are) engaged in commerce within the meaning of 42 U.S.C. § 2000e(g).

86. **PRAYER FOR RELIEF**

87.     The Plaintiff incorporates by reference paragraphs 8 through 66 of this Complaint as though full set forth at length therein.

88. **WHEREFORE,** plaintiff requests the this Court grant the following relief:

a. Defendant compensate the Plaintiff for the wages and other benefits and other emoluments of employment lost, because of its unlawful conduct;

b. Defendant pay to the Plaintiff punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental and physical anguish, loss of enjoyment of life and other non-pecuniary losses as allowable;

c. Defendant pay to the Plaintiff , pre and post judgement interest, costs of suit, and expert witness fees as allowed by law;

d. The Court award such other relief as is deemed just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: __11/7/14__

_____
Signature of Plaintiff



**U.S. Equal Employment Opportunity Commission**
**Buffalo Local Office**

6 Fountain Plaza
Suite 350
Buffalo, NY 14202
(716) 551-4442
TDD: 1-800-669-6820
Fax: (716) 551-4387
1-800-669-4000

Respondent: SYRACUSE UNIVERSITY
EEOC Charge No.: 520-2014-01109
FEPA Charge No.:

March 21, 2014

Patrick J. Boyd
THE BOYD LAW GROUP, PLLC
370 Lexington Avenue Suite 1705
New York, NY 10017

Dear Mr. Boyd:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

[ X ]   Title VII of the Civil Rights Act of 1964 (Title VII)
[  ]    The Age Discrimination in Employment Act (ADEA)
[ X ]   The Americans with Disabilities Act (ADA)
[  ]    The Equal Pay Act (EPA)
[  ]    The Genetic Information Nondiscrimination Act (GINA)

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

Please be aware that we will send a copy of the charge to New York State Division Of Human Rights Federal Contract Unit One Fordham Plaza, 4 Fl. Bronx, NY 10458 as required by our procedures. If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official. Then the agency will investigate and resolve the charge under their statute. If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding. To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case. Otherwise, we will generally adopt the agency's finding as EEOC's.

While the charge is pending, this office should be notified of any change in your client's address, or where they can be reached if they have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

_____
John E. Thompson
Local Office Director
(716) 551-5287

Office Hours: Monday – Friday, 8:30 a.m. - 5:00 p.m.
www.eeoc.gov

Enclosure(s)

cc:   Elizabeth Fowler
      1062 Lancaster Avenue
      Syracuse, NY 13210

**CHARGE NUMBER**:

520-2014-01109

**CHARGING PARTY**:

**RESPONDENT**:

<u>CHARGE OF DISCRIMINATION UNDER</u>
<u>FEDERAL, STATE AND LOCAL LAW</u>

EQUAL EMPLOYMENT OPPORTUNITY MADISON
NEW YORK DISTRICT OFFICE
ENFORCEMENT UNIT I, II

**JAN 3 0 2014**

**DATE RECEIVED**

Elizabeth Fowler ("Charging Party" or "CP") 
1062 Lancaster Avenue
Syracuse, NY 13210

Syracuse University ("Respondent" or "SU")
900 South Crouse Avenue
Syracuse, NY 13244

CHARGE BASIS: Discrimination on the basis of disability.  Please be advised that this charge is to be filed under Federal, State and local law.

1. Charging Party is a resident of Onondaga County and was, as such, a resident of the State of New York at all times relevant to this charge.
2. Charging Party started working for Respondent on or around 2004.
3. Charging Party is an assistant professor at SU's School of Visual and Performing Arts.
4. Charging Party is and has been dedicated to her job.
5. Charging Party always received satisfactory or better ratings in her performance reviews.
6. Charging Party was on track to receive tenured professorial status at SU.
7. In or around 2010, Charging Party took her first medical leave of absence due to neck surgery.
8. Charging Party never fully recovered and, as a result, continued to suffer from her condition until mid-December 2012.
9. Charging Party's time off was approved as a matter of right per SU's policy.
10. The practice of universities in general, and SU in particular, is to exclude leave time (and work completed during that time) from tenure consideration.
11. As such, Charging Party's time recuperating was not to be considered in her eligibility for tenure.
12. Notwithstanding this policy, however, during Charging Party's 2011-2012 contract renewal meeting, Charging Party's disability became a major topic of discussion as several faculty members expressed displeasure about Charging Party's time off to get well.
13. Shortly afterwards, on or around November 6, 2012, Charging Party's department chair, Joanna Spitzner ("Spitzner") met with Charging Party and informed her for the first time that Charging Party's department was "very concerned" about her ability to do her job.
14. Spitzner told Charging Party that the department felt that her health was getting in the way of her teaching and scholarship, which would negatively impact Charging Party's tenure outcome.

1

15. Spitzner then demanded that Charging Party to visit the Faculty and Staff Assistance Program (FSAP) to "talk to someone about [Charging Party's] problems."

16. Spitzner informed the FSAP about Charging Party's medical condition, surgery, and depression.

17. This action was done without Charging Party's knowledge or permission.

18. Charging Party informed Spitzner that she was already visiting a therapist and a psychiatrist of her own choosing.

19. Incredibly, Spitzner nevertheless continued to demand that Charging Party visit the Faculty and Staff Assistance Program (FSAP) and went so far as to contact one of the therapists to try to set up an appointment for Charging Party, without Charging Party's knowledge or permission.

20. Spitzner also met with Charging Party off-campus during this period, during which time she provided written materials from the Faculty Staff and Assistance Program (FSAP), and strongly suggested that if an appointment was not made, she would not allow Charging Party to continue teaching the following semester.

21. In or around middle of January 2013, during the first week of the spring 2013 semester, Spitzner met with Charging Party and demanded that she stop teaching all of her courses due to "all of [Charging Party's] continuing problems."

22. Spitzner alleged that the problems were impacting Charging Party's ability to teach and that the department was "losing faith in her."

23. It was later discovered that, without Charging Party's knowledge, Spitzner informed Dana Butler of SU's Retirement and Leave of Absence Specialist in the Human Resources about Charging Party's medical condition, surgery, and depression.

24. This was – shockingly - done without Charging Party's permission.

25. On or around April 18, 2013 - despite all of Charging Party's past positive reviews - she was informed that she was no longer eligible for tenure due to a departmental vote.

26. Charging Party was further informed that she would be on a terminal contract – thus fired at the end of the 2013 academic year.

27. This completely contradicted all of Charging Party's prior reviews.

28. By way of example, during Charging Party's third-year review before the 2011-2012 meeting, she was told that she was "on track for tenure" and she was a "gifted and talented teacher."

29. Charging Party was denied access to all of the documents relating to the votes and notes from the 2011-2012 meeting, both from Spitzner and Dean of the College of Visual and Performing Arts, Dean Ann Clarke ("Dean Clark").

30. Upon information and belief, it is SU's policy to provide these documents to tenure-track professors and to procure their signature of acknowledgment.

31. When Charging Party's attorney contacted SU to raise concerns about SU's discriminatory practices, Charging Party was placed back on the tenure track by Dean Clarke.

32. This move clearly evidences SU's discriminatory animus towards Charging Party when she was unrepresented, and SU's recognition of its own errors.

2

34. Upon information and belief, other disabled professors in the same school within the College of Visual and Performing Arts, both under Dean Clarke have been discriminated by SU in similar fashions and with her full knowledge.

35. This is notwithstanding the fact that SU has a specific department called the "Syracuse University Disability Cultural Center," which champions the protection of disabled people against precisely this type of treatment.

36. Charging Party continues to be harassed and treated unfairly, and continues to be discriminated against in the terms and conditions of her employment at SU because of her continued disability.

37. In early September of 2012, the new departmental chair, Christopher Wildrick ("Wildrick") demanded that CP vacate her office, removing all of her possessions, to make way for a new part-time faculty member, even though there was an adjunct professors' office available.

38. Later Wildrick admitted in writing that he had no idea when Charging Party would be returning from medical leave, but yet still requested her to vacate - treating her in a manner exceptionally unfair when compared to all other departmental members.

39. When it was pointed out in writing by Charging Party to Wildrick that this was exceptional and unprecedented treatment, he immediately dropped the request.

40. In November of 2012, Wildrick refused, without any policy justification, to print business cards for Charging Party stating in writing that, although he never investigated the formal policy, he felt that ordering business cards constituted "work" and refused order or pay for them as Charging Party was on medical leave.

41. Upon information and belief, Dean Clarke was fully aware of all of the aforementioned actions after the departmental vote in 2012, including Wildrick's mandate to have CP vacate her office and the refusal to print business cards, but did nothing to intervene or rectify the situation.

42. Dean Clarke has allowed, and de facto endorsed, the continued harassment and discrimination of Charging Party by members of SU's faculty.

43. The above-referenced discriminatory acts are a representative sample but not an exhaustive list of the unlawful actions committed by Respondent.

I hereby affirm that the above-referenced charge is accurate to my knowledge and belief.

_Elizabeth Fowler_
Elizabeth Fowler

Subscribed and sworn to
before me this _6th_ day
of January _6_, 2014

ROBERT J. ZUCCARO
Notary Public, State of New York
Qualified in Onondaga County
Reg. No. 01ZU6178309
My Commission Expires April 4, 2016



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Buffalo Local Office**

6 Fountain Plaza, Suite 350
Buffalo, NY 14202
(716) 551-4442
TTY (716) 551-5923
FAX (716) 551-4387

Elizabeth Fowler
1062 Lancaster Ave.
Syracuse, NY 13210

Re:   EEOC Charge No.: 520-2014-01109
      Elizabeth Fowler v. Syracuse University

Dear Ms. Fowler:

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission"), has reviewed the above-referenced charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

In accordance with these procedures, we have evaluated your charge based upon the information and evidence submitted. You alleged that you were discriminated against because of your disability.

Respondent's position statement has been previously shared with you. You were required to produce a rebuttal by July 1, 2014. You were informed that if you did not provide a rebuttal, the Commission was going to make a determination with the information already assembled. An extension of time to provide a rebuttal was granted, but your rebuttal was not received.

Based on the information assembled, the Commission is unable to conclude that the information establishes a violation of Federal Law on the part of Respondent. This does not certify that Respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

The Commission's processing of this charge has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charge within 90 days of receipt of said notice. Otherwise, your right to sue will be lost. Please contact Federal Investigator Nelly Sanchez at (716) 551-3378 if you have any questions.

Sincerely,

Date:                                         _____ for

John E. Thompson, Jr., Director
Buffalo Local Office

CC:   Patrick J. Boyd
        370 Lexington Ave., Suite 1705
        New York, NY 10017

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Elizabeth Fowler<br>1062 Lancaster Avenue<br>Syracuse, NY 13210 | From: | Buffalo Local Office<br>6 Fountain Plaza<br>Suite 350<br>Buffalo, NY 14202 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2014-01109** | Nelida Sanchez,<br>Investigator | **(716) 551-3378** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____
John E. Thompson,
Local Office Director

(Date Mailed)

Enclosures(s)

cc: | Dana Butler<br>Human Resources<br>SYRACUSE UNIVERSITY<br>900 South Crouse Avenue<br>Syracuse, NY 13244 | Peter A. Jones, Esq.<br>One Lincoln Center<br>Syracuse, NY 13202 | Patrick J. Boyd<br>The Boyd Law Group, PLLC<br>370 Lexington Avenue Ste. 1705<br>New York, NY 10017 |

Enclosure with EEOC
Form 161 (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --  Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS  --  Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit *before 7/1/10 – not 12/1/10* -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION  --  Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE  --  All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*